# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| Linda A. Hillis, | ) | |
| | ) | |
| Plaintiff, | ) | No. 10 C 0477 |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | Judge Edmond E. Chang |
| Larson Engineering, Inc. | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Linda Hillis filed this lawsuit against Larson Engineering alleging violations of the Family and Medical Leave Act, 29 U.S.C. § 2061, *et seq.* (FMLA) and the Americans with Disabilities Act, 42 U.S.C. § 12101, *et. seq.* (ADA), stemming from the termination of her employment by Larson. Hillis claims that she is entitled to recovery under the FMLA because she was denied benefits and because Larson fired her for requesting medical leave. She also claims that Larson discriminated against her and failed to accommodate her under the ADA. This case is now before the Court on Larson's Motion for Summary Judgment. R. 25.[1] For the reasons stated below, Larson's motion is denied.

---

[1] Citation to the docket is "R." followed by the entry number and, when necessary, the page/paragraph number.

# I.

Linda Hillis, who suffers from carpal tunnel syndrome, was hired by Larson Engineering on July 23, 2007. R. 26 ¶¶ 6-7. Hillis was a staff accountant, and her duties included processing daily cash receipts, managing accounts receivable and collection efforts, preparing reports, invoicing clients, managing write-offs and bad debts, entering timesheets, calculating overtime processing expense reports, and handling project budget worksheets. *Id.* ¶ 8. Her job duties also included setting employee reimbursement rates for Lynette Olsson, an employee hired six months after Hillis. Olsson often worked for other branch offices of Larson, and when she did, her time would be billed to that specific office. R. 31 ¶ 12. Hillis was in charge of keeping track of Olsson's time and invoicing the other offices for Olsson's time. *Id.*

On July 2, 2008, Hillis received a request from Larson's Wisconsin office to lower Olsson's rate. *Id.* ¶ 13. On the same day, Larson's Chief Financial Officer, Philip Deimel, asked Hillis to reduce Olsson's rate to fifty dollars an hour. *Id.* ¶ 14. Hillis followed Deimel's instructions without contacting her direct supervisors, Jack Pastore and Joe Tinder. *Id.* ¶ 16. Both were out of the office at the time. *Id.*

The next afternoon, Pastore (one of Hillis's direct supervisors) received an e-mail from Hillis, stating:

> I am very frustrated regarding my situation here at Larson. I am getting anger addressed to me instead of clear direction. It is clear you are upset with me changing the rates that Lynette gets billed out at, but I was put in the middle! Do you want me to ignore a directive from Phil D[eimel]? Including all future directives? I was told to reissue the invoices in your absence! I changed the invoices to facilitate the close and balancing between the offices. I assumed we could readdress this question on the

rates next week when everyone was back in the office. Jack, we need to talk. Please let me know the soonest we can do this.

R. 26 ¶ 20. On July 7 (the following Monday), Hillis met with Pastore and Tinder to talk about the rate change incident.[2] *Id.* ¶ 21. During this meeting, Pastore and Tinder explained to Hillis that she should have contacted one of them before changing the invoice and changing the billing rate. *Id.* Beyond what Pastore and Tinder explained, the substance of this meeting is disputed by both parties.

Soon after this meeting, Hillis contacted her supervisors to confirm vacation time that she had scheduled for the next month. R.32, Exh. 2 ¶ 50. She had previously requested this vacation in January 2008, intending it to be "a real vacation." *Id.* ¶ 49. As her carpal tunnel syndrome symptoms grew worse, however, she changed her plans and intended to use this time for surgery and recovery time. *Id.* ¶ 50. She explained to her supervisors that she would be needing surgery for her carpal tunnel syndrome. *Id.*

On July 24, 2008, Larson fired Hillis, effective immediately. R. 26 ¶ 28. Hillis filed a complaint with the EEOC, and on October 28, 2009, the EEOC issued her a right to sue letter, R.1, Exh. 1. Hillis then filed this lawsuit in January 2010.

---

[2]Pastore claims that on July 3, he asked Hillis why she changed the rate without regional manager approval. R.26 ¶ 19. Hillis denies that this conversation ever took place. R. 30 at 9.

## II.

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quoting Fed R. Civ. P. 56(e)).

## III.

Hillis has alleged violations of the ADA[3] and the FMLA. There are four separate claims in her two-count complaint. Hillis seeks relief under the ADA's discrimination and retaliation provisions, and under the FMLA's interference and retaliation provisions. R. 1 ¶¶ 50, 56-86. This Court will address each of them in turn.

---

[3]Significant changes to the ADA took effect on January 1, 2009, after this action was filed. See ADA Amendments Act of 2008, Pub.L. No. 110–325, 122 Stat. 3553 (2008). Since Congress did not express its intent for these changes to apply retroactively, the Court looks to the law in place before the amendments. *See Fredricksen v. United Parcel Serv., Co.*, 581 F.3d 516, 521 n. 1 (7th Cir. 2009).

4

## A. ADA Discrimination

To survive summary judgment, the plaintiff must produce sufficient evidence for a reasonable trier of fact to find that (1) he was disabled within the meaning of the ADA, (2) that he is qualified to perform the essential functions of the job, either with or without a reasonable accommodation, and that (3) he suffered from an adverse employment action because of his disability. *Nese v. Julian Nordic Const. Co.*, 405 F.3d 638, 641 (7th Cir. 2005) (citing *Byrne v. Board of Educ., School of West Allis-West Milwaukee*, 979 F.2d 560 (7th Cir. 1992)). A plaintiff has met his burden on summary judgment if he produces "evidence supporting an 'inference' that discrimination was 'a determining factor'" in the employer's adverse employment action. *Germano v. International Profit Association*, 544 F.3d 798, 806 (7th Cir. 2008) (quoting *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1154 (10th Cir. 2008)). If the employer demonstrates a legitimate, non-discriminatory reason, the plaintiff must show that there is a genuine issue of fact that the proffered reason is pretextual. *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 (7th Cir. 1995)). A nonpretextual reason need not be a good reason, and the Court need not agree that it was a prudent, wise, or correct reason for the business action taken. *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000); *Green v. Nat'l Steel Corp.*, 197 F.3d 894, 900 (7th Cir. 1999).

With regard to the first element, a plaintiff can show that she is disabled for the purposes of the ADA through one of three ways: (1) she has a physical or mental impairment that substantially limits her in one or more major life activities; (2) she

has a record of such an impairment; or (3) her employer regarded her as having such an impairment. *Nese*, 405 F.3d at 641 (citing 42 U.S.C. § 12102(2)). Hillis takes the first approach.

The ADA defines major life activities as including, but not limited to, "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Dvorak v. Mostradi Platt Associates, Inc.,* 289 F.3d 479, 483 (7th Cir. 2002) (quoting 29 C.F.R. § 1630.2(i)). Hillis's declaration avers that she suffers from carpal tunnel syndrome and that this condition prevents her from caring for herself and her family. R. 32 ¶ 38. Her sleep is constantly disrupted from numbness in her hand and in her arm. *Id.* Hillis is also unable to cut her own food, open jars, cook, clean, or engage in other everyday life activities. *Id.*

Larson argues that Hillis cannot meet the disability requirement because Larson did not *regard* her as being disabled. R. 27 at 8-9. Larson claims that Hillis's managers were not aware of her carpal tunnel syndrome when they decided to fire her. R.27 at 9. They claim that they only learned about it eleven days later, on July 18. *Id.* Although these arguments are relevant to whether there is sufficient evidence to conclude that Larson fired Hillis because of her disability (see *infra*), they do not bear on whether Hillis meets the first element of an ADA discrimination claim because Hillis contends– with sufficient evidence–that she has an *actual* disability that substantially limits her life activities. Those claims are undisputed by Larson. The

"regarded as" requirement is just one of three approaches that a plaintiff can take, and Larson need not rely on that approach here.

With regard to the second element, whether Hillis was a qualified employee is disputed by the parties. R. 31 ¶11; R. 27 at 5. According to Pastore, Hillis had struggled to keep up with her workload, causing him to reduce her job duties. R. 26 ¶ 30. Even with this reduction, Hillis's performance continued to suffer. *Id.* ¶ 31. She would fail to create complete applicable rate tables, which skewed monthly reports. R. 26 ¶ 32. Reminders by one of Larson's human resources specialists, Marissa Pacelli, did not help. *Id.* Moreover, Hillis failed to keep track of which employees were hourly and which were not, which caused employees to be underpaid or overpaid. *Id.* ¶ 33. As a result, her supervisors had to make several payroll timesheet adjustments. *Id.* Hillis also failed to complete the 2007 Illinois sales tax return for Illinois office, causing Larson to sustain penalties for late filing. *Id.* ¶ 34.

Hillis denies that she performed poorly. In addition to disputing Larson's characterization of her specific job duties,[4] Hillis references her January 2007 employee review in defense of her record of performance. R. 32 ¶ 37. Indeed, most of her job performance ratings fell between 3.5 and 4.5 (out of 5.0). R. 32, Exh. 10 at 4. Pacelli herself gave Hillis a generally positive review in January 2008:

> [Hillis] does an overall good job – I have been very pleased with her efforts – sometimes it appears that she "drops the ball" maybe an organizational problem? It doesn't occur often but it does come up . . .

---

[4] For example, Hillis denies that implementing the 2007 Illinois Sales Tax Return was among her job duties. R. 31 ¶ 35.

> [Hillis] has no problem taking on the stuff we have asked – she got Lynette going with little help from me.

*Id.* at 5-6. Even in the month that she was fired, July 2008, Hillis received good reviews from another manager. R.32, Exh. 8 at 7-8. In light of this track record, Hillis has presented sufficient evidence to create a genuine issue over whether she was qualified.

With regard to the third element, Hillis must show that she was terminated because of her disability. "[A] plaintiff complaining of discriminatory discharge under the ADA must show that his or her employer would not have fired him but for his actual or perceived disability; proof of mixed motives will not suffice." *Serwatka v. Rockwell Automation*, 591 F.3d 957, 962 (7th Cir. 2010).

Larson claims that Hillis was fired because she was insubordinate at the July 7 meeting. R. 26 ¶ 23. Larson claims that during the meeting, Hillis could not bring herself to admit that she did anything wrong. She grew "defensive" and "refused to acknowledge that she handled the matter improperly." *Id.* She denied ever receiving any instructions requiring her to seek their approval prior to changing the billing rate. She insisted that the CFO had the authority to direct her to change the rate. And most alarmingly, she "suggest[ed] that if this happened again, she would handle it the same way." R. 26 ¶ 22. Pastore and Tinder claim that right after this July 7 meeting, they decided to fire Hillis because she was insubordinate. They determined that she demonstrated an unwillingness to learn or to take direction from her supervisors. R. 26 ¶ 23.

But there is sufficient evidence to dispute that those grounds were the basis of Hillis's termination. Before discussing the evidence, it is worth noting that if the jury were to find that Larson's supervisors did in fact fire Hillis based on the proffered reasons, then that would require a finding of no liability, even if the proffered reasons could be characterized as poor business decisions, or as unfair, or as not well documented. The jury may reasonably infer from the evidence that the decision-makers did not in fact act for the proffered reasons; but the jury could also find that the decision-makers honestly believed that Hillis had been performing poorly or was insubordinate.

With regard to whether Hillis defied a directive not to change Olsson's rate, there is little evidence that Hillis was ever notified that she had to seek manager approval before changing the rate. Tinder did not directly tell Hillis that she needed manager approval. R. 26, Ex. D ¶ 10. He, like Pastore, relied on human resources specialist Pacelli to send the message that regional manager approval was required. R. 26, Ex. B ¶ 13. Pacelli claims that she "instructed [Hillis] not to change the billing rate or reissue invoices without advising Tinder and/or Pastore first." R. 26, Ex. C ¶ 24. Larson provides this July 2 e-mail from Pacelli to Tinder and Pastore:

> I recommended to [Hillis] that she verify that with you 2 (even though the change was fine she should still check with people from our office to ensure there is no misunderstanding) but I don't know if she will.

R. 26, Exh. C-10. "Recommended"–the description offered by Pacelli in the contemporaneous e-mail–is not necessarily the same as "instructed," though. The e-mail's description of the interaction between Pacelli and Hollis does not sound like

9

Pacelli *ordered* Hillis to seek regional manager approval first. Instead, it sounds more like Pacelli *suggested* to Hillis that she might want to contact Pastore and Tinder. Hillis's declaration is consistent with this interpretation:

> On the day of the incident I was on my way to lunch and I mentioned the discrepancy to Marissa Pacelli. While she did advise me to talk to Jack [Pastore] or Joe [Tinder], it was not significant or even provided in a demanding manner, rather an off-hand comment.

R.32, Exh. 2 ¶¶ 15-16.

In some tension with the contemporaneous e-mail of July 2 is a handwritten note dated July 3, in which Pacelli wrote:

> Joe and Jack were both out of town – Linda [Hillis] changed the invoices based on some correspondence she got from Phil. She mentioned it to me and *I emphasized that she should not change* any invoices without getting [Pastore and Tinder's] approval.

R. 26, Exh. 3 at 44 (emphasis added). This note–written a day later–does not match up with the language in the e-mail from the previous day, where Pacelli *recommended* that Hillis *verify* the rate change. Accordingly, in light of Hillis's declaration and the July 2 e-mail, a reasonable trier of fact could find that Hillis did not need to request permission before changing Olsson's rate.

According to Hillis, the July 7 meeting was the first time she had ever heard that she needed to seek Pastore and Tinder's approval before changing billing rates.[5] She had always been under the impression that Philip Deimel, the company's CFO,

---

[5] According to Larson, on July 3, Pastore asked Hillis why she changed the billing rate without Regional manager approval. R. 26¶ 19. Hillis denies that this discussion ever happened. R. 31 at 9.

10

had the authority to direct her to change billing rates because he had done so on previous occasions. R. 32, Exh. 2 ¶ 30. Moreover, Hillis remembers a different version of the July 7 meeting. She insists that she said that in the future, before changing Olsson's rate, she would seek management's approval. R. 46 ¶ 6. She denies saying that if it ever happened again, she would handle the situation the same way. R. 46 ¶ 24. She denies being confrontational or insubordinate in any way. R. 46 ¶¶ 28-29.

Besides the insubordination charge, Larson also claims that Hillis had a history of poor performance, and that this was part of the reason why she was fired. Pastore claims that Hillis was "not always able to stay on top of accounts receivable issues, including collections calls and accounts payable invoices were occasionally being paid late causing Larson to incur late fees." R. 26, Exh. B ¶ 7. But aside from declarations made by Larson employees after this lawsuit was filed, there is not much in the record that, when viewed in the light most favorable to Hillis, rebuts Hillis's evidence that she was performing to Larson's expectations. It is true that Pastore filled out an employee review in July 2008 describing Hillis's shortcomings. R.26, Exh. B-4. But it is unclear exactly when this review was completed. It is entirely possible that the review was filled out in July after management had decided to fire Hillis. Indeed, even in one of the July 2008 reviews, Hillis received 8 out of 9 "effective" to "very effective" scores from another manager. R.32, Exh. 8 at 7-8.

And although January 2008 reviews–the only other time Larson employees were reviewed that year–from other managers are in the record, none were completed by Pastore. As noted above, Pacelli gave Hillis a generally positive review in January

11

2008. Exh. 32, Exh. 8 at 5-6 ("does an overall good job – I have been very pleased with her efforts"). Tinder's reviews of Hillis present problems as well. Although he gave Hillis poor marks in a July 2008 review, R. 26, Exh. D-2, he did not write a single negative remark on her January 2008 review. R. 32, Exh. 10 at 9. In fact, there is nothing in the entire review except the words "RMT invoices" written cryptically in one of the comments sections. *Id.*

In the end, these factual disputes are not questions for this Court to decide on summary judgment. They are questions for a jury. A jury may reasonably believe that Hillis was insubordinate and that Pacelli instructed Hillis not to change the billing rate and invoices until she received supervisor approval. But the jury may also reasonably believe that Hillis was not insubordinate because she was never told that she had to ask Tinder and Pastore for their permission before changing Olsson's rate, and indeed that she did not need such permission. In that case, a jury could find that the insubordination charge was unsubstantiated and was in fact, pretext for a discriminatory motive. There is a genuine issue of material fact and this Court denies Larson's motion for summary judgment on the discrimination claim.

**B. ADA Failure to Accommodate**

To establish a failure to accommodate claim under the ADA, "the plaintiff, in addition to showing that she is a qualified individual with a disability, must show that the employer was aware of her disability and still failed to reasonably accommodate it." *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001). As discussed above, there is a genuine issue of material fact as to Hillis's job performance. The key

argument that Larson makes on the failure-to-accommodate claim is whether the decision-makers were aware of her alleged disability.

Larson argues that it fired Hillis with no knowledge of her carpal tunnel syndrome. R. 26 ¶¶ 41-53. Pacelli claims that she was not told of Hillis's disability before July 8. *Id.* ¶ 44. Pastore and Tinder claim that they did not learn of Hillis's disability until July 18, when Hillis e-mailed them that she was scheduled to undergo surgery. *Id.* at 53. Larson concedes that they were advised of Hillis's previous absences for medical appointments, but they insist that they were unaware any of these absences were due to her carpal tunnel syndrome. *Id.* ¶¶ 46-47.

Hillis claims, under oath, that Larson knew about her carpal tunnel syndrome. First, Hillis details a conversation with Pastore around March 2008 where she discussed her condition. R.32 ¶ 1. Second, Hillis claims that Tinder asked her about her carpal tunnel syndrome after he saw her in the hallway wearing a wrist brace. *Id.* ¶ 2. Third, Hillis explains that she had discussed her carpal tunnel syndrome with her colleagues at work. *Id.* ¶¶ 7-9.

At this stage, both accounts can be reasonably found by the jury. Hillis's supervisors might have been unaware of her carpal tunnel syndrome until after they had decided to fire her. But Hillis avers that she discussed her condition with Pastore, Tinder, Pacelli, and other Larson employees. Hillis has presented sufficient evidence to raise a genuine issue of material fact. Summary judgment is therefore denied with regard to the failure to accommodate claim.

C.  **FMLA Interference**

When an employee alleges that his employer interfered with his substantive rights under the FMLA, he must establish that: "(1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of [her] intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled." *Cracco v. Vitran Exp.*, 559 F.3d 625, 635-36 (7th Cir. 2009) (citing *Burnett v. LFW*, 472 F.3d 471, 477 (7th Cir.2006)).

Larson's only argument[6] is that it did not interfere with Hillis's FMLA rights because she was fired for insubordination. R. 27 at 11. Larson cites *Daughtery v. Wabash Center*, 577 F.3d 747 (7th Cir. 2009), arguing that employers may deny employees FMLA leave if the termination is based on legitimate, work-related reasons. To the extent that Larson is arguing that it did not discriminate against Larson for exercising FMLA rights, that is not relevant to a FMLA interference claim. *Diaz v. Fort Wayne Foundry*, 131 F.3d 711, 713 (7th Cir. 1997). To the extent that Larson is arguing that Hillis was not entitled to FMLA leave because she was fired for failing to adequately perform her job, the discussion above, *see supra* § III.A., details why there

---

[6]According to Larson, Pastore and Tinder first learned that Hillis planned to take off work for surgery about three weeks beforehand. R. 26 ¶ 53. But the "notice requirements of the FMLA are not onerous." *Burnett*, 472 F.3d at 478 (citing *Phillips v. Quebecor World RAI*, 450 F.3d 308, 311 (7th Cir. 2006)). "When the approximate timing of the need for leave is not foreseeable, an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the case." 29 C.F.R. § 825.303(a). Moreover, Larson does not raise the issue of late notice to dispute the notice requirement of Hillis's FMLA interference claim. It is mentioned in support of Larson's position that it did not learn that Hillis was taking leave until *after* it was decided that she would be fired. R. 26 ¶¶ 41-57.

14

is a genuine issue of material fact as to that assertion. Therefore, this Court denies Larson's motion for summary judgment for the FMLA interference claim.

### D. FMLA Retaliation

The FMLA also provides employees protections if they are discriminated against for exercising their FMLA rights. 29 U.S.C. § 2615(a)(1). The FMLA prohibits employers from considering the taking of FMLA leave as a negative factor in employment actions. 29 C.F.R. § 825.220. When a plaintiff alleges a retaliatory discharge under the FMLA, a plaintiff may establish that her employer engaged in discriminatory conduct through one of two ways: the indirect method and the direct method. *Goelzer v. Sheboygan County*, 604 F.3d 987, 995 (7th Cir. 2010).

Hillis first attempts to prove her claim by taking the indirect method. To proceed under the indirect method, Hillis "must show that after taking FMLA leave (the protected activity) [she] was treated less favorably than other similarly situated employees who did not take FMLA leave, even though [she] was performing [her] job in a satisfactory manner." *Hull v. Stoughton Trailers*, 445 F.3d 949, 951 (7th Cir.2006). Hillis attempts to do this by introducing personnel documents for "Amy" and "Janice." R. 32, Exh. 3; R.32, Exh. 4. Amy, a former Larson employee, took FMLA leave and was "picked on, criticized, and monitored" more than others. R.32 ¶ 30. Janice, who was hired as Hillis's replacement, took non-FMLA leave, and was not fired. R.32, Exh. 4.

But these are not similarly situated employees. "To meet her burden of demonstrating that another employee is 'similarly situated,' a plaintiff must show that there is someone who is directly comparable to her in all material respects." *Patterson*

15

*v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). In this inquiry, the plaintiff's particular job duties and work history are relevant. *Hull v. Stoughton Trailers*, 445 F.3d 949, 952 (7th Cir. 2006). Hillis needed to provide evidence of other employees who (1) did not file for FMLA leave, (2) were accused of insubordination or of bad work performance, but (3) received favorable treatment. Janice is not directly comparable because she was not accused of being insubordinate. To the extent that Hillis tries to argue that Amy's treatment shows a pattern of anti-FMLA sentiment, that is only one other instance and is inadequate to demonstrate like treatment. Therefore, Hillis must proceed under the direct method.

Under the direct method, a plaintiff must present evidence that her employer took materially adverse action against her on account of her protected activity. *Burnett*, 472 F.3d at 481. "If [the evidence is contradicted,] 'the case must be tried unless the defendant presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had no retaliatory motive . . . .'" *Id.* (quoting *Stone v. City of Indianapolis Public Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). The plaintiff can overcome summary judgment by producing circumstantial evidence of retaliation such that a jury could infer retaliation. *Phelan*, 464 F.3d at 788.

The parties do not dispute that Hillis engaged in protected activity when she requested medical leave for surgery on her wrist, or that she suffered an adverse employment action when she was fired from her job. Instead, Larson argues that it had

16

no retaliatory motive because Hillis was fired because for poor work performance and for insubordination. R. 27 at 3-5.

As discussed above, however, there is a genuine issue of material fact over whether Hillis was indeed performing poorly or fired for insubordination. Moreover, the temporal proximity between the protected activity and the adverse employment action is relevant, although not dispositive, when examining a retaliation claim. *King*, 166 F.3d at 893. On July 18, Hillis notified her superiors that she would be taking time off on August 7, in order to undergo surgery for her wrist. R. 32, Exh. 2 ¶ 50. Six days later, on July 24, Hillis was fired from her job. R. 1 ¶ 29. The Seventh Circuit has found that a week's time is enough to infer a causal link. *McClendon v. Indiana Sugars*, 108 F.3d 789, 797 (7th Cir. 1997) (citing *Holland v. Jefferson Nat'l Life Ins.*, 883 F.2d 1307, 1314-15 (7th Cir. 1989)). Moreover, the day Larson fired Hillis was the same day she became eligible for FMLA leave.[7]

Larson argues that the decision to fire was made not on July 18. According to Larson, Pastore and Tinder agreed to fire Hillis immediately following the July 7 meeting, which was before they knew that she would seek medical leave. Larson asserts that soon after July 7, it began to search for Hillis's replacement. Larson provides several documents showing that they communicated with Robert Half Finance & Accounting (the employee placement agency), R. 26, Exh. C-12, and that Pastore,

---

[7]Employees are entitled to FMLA leave after one year of employment. 29 U.S.C. § 2611(2)(A). Hillis was hired on July 23, 2007, R. 26 ¶ 7, and was fired a year and a day later, on July 24, 2008, R. 1 ¶ 29. Her time off for the surgery would have been taken after eligibility had been triggered.

17

Tinder, and Pacelli seriously considered several prospective accountants. *Id.* at Exh. C-13.

Once again, however, the only evidence Larson provides that these were intended to be Hillis's replacements are declarations from Pastore, Tinder, and Pacelli. R. 26 Exh. B 23; Ex. C ¶ 28; Ex. D ¶ 18. What is missing are any contemporaneous personnel or human resources documents that one would reasonably expect if the termination decision had been made and that the placement agency was supplying a replacement for an incumbent accountant. Therefore, that Larson contacted Robert Half Finance & Accounting does not establish that it had already decided to let go of Hillis. A reasonable fact finder could find that Hillis was fired shortly after she requested FMLA leave, and not on July 7.

## IV.

For the reasons stated above, Larson's motion for summary judgment is denied.

ENTERED:

*[signature: Edmond E. Chang]*

Honorable Edmond E. Chang

DATE: July 5, 2011

18